STATE OF VERMONT

ENVIRONMENTAL COURT

Appeals of Wesco, Inc.         }
                                              }
                                              }     Docket Nos. 65-3-00 Vtec and
                                              }            66-3-00 Vtec
                                                }
                                              }

## Decision and Order

Appellant Wesco, Inc. appealed from two decisions of the Development Review Board (DRB) of the City of South Burlington, denying two alternative site plans for their property at 1108-1118 Williston Road, one plan for a convenience store with three gasoline dispensers (6 gasoline fueling positions) and one diesel fueling position, and another plan for the same convenience store with two gasoline dispensers (4 gasoline fueling positions) and one diesel fueling position. Both plans were denied on the basis that they fail to comply with the traffic provisions of the Zoning Regulations in general and those of the Traffic Overlay District in particular. Appellant= s appeal of the 3-dispenser plan is Docket No. 65-3-00 Vtec; Appellant= s appeal of the 2-dispenser plan is Docket No. 66-3-00 Vtec. The latter decision also denied conditional use approval for the two-dispenser proposal, even though an earlier unappealed decision had granted conditional use approval of the three-dispenser proposal.

Appellant-Applicant is represented by Mark B. Heath, Esq.; the City of South Burlington is represented by Steven F. Stitzel, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit alone, by agreement of the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellant owns two adjacent parcels of property on the northerly side of Williston Road near the intersection of Williston Road and Dorset Street, one with the address of 1118 Williston Road (Lot 1) and the other with the address of 1108 Williston Road (Lot 2). Both parcels are located in the Commercial 1 zoning district and the Traffic Overlay Zone 2. The combined square footage of the two parcels is 40,440 square feet.

The 1118 Williston Road parcel contains a gasoline service station use consisting of a building containing a three-bay repair garage, with three gasoline dispensers (6 gasoline fueling positions) on two islands parallel to Williston Road in front of the garage, plus a single diesel fueling position at the southeast corner of the building. Access around the building to the west and north sides is by a narrow lane which is often blocked by vehicles associated with the service station uses. Lot 1 has two curb cuts, each 40 feet wide, with access onto Williston Road. It has also has access on its northerly side through to the parking area of the adjacent Windjammer Restaurant and Best Western Hotel, through which there is access to the east to a signalized intersection onto Williston Road. Access from the hotel property across Lot 1 onto Williston Road at present has the status of a revokable license granted by Appellant; Appellant proposes to make that access permanent in connection with the present proposal.

The 1108 Williston Road parcel is located adjacent and to the west of the service station parcel, closer to a major intersection to the west. Between it and the highway interchange to the west is the entrance to another hotel/restaurant complex. Lot 2 formerly contained a house and

residential garage, and has a single driveway access onto Williston Road. The house has been removed; the former residential garage currently is used for incidental storage by Appellant during the pendency of this case. The intersection to the west of this parcel controls Dorset Street, Williston Road, the entrance to the other hotel complex, and is very close to the northbound entrance ramp for Interstate 89. Beginning at the westerly edge of Lot 2, the two westbound lanes of Williston Road make a tapered shift[1] to the right to accommodate two additional left turn lanes for the westbound Williston Road traffic turning south onto Dorset Street.

Appellant proposes to merge the two lots and to convert the use of the service station building to a convenience store with a twelve-seat deli. The merged property meets the frontage, lot coverage, and setback requirements of the zoning regulations, with the exception of the setback of the canopy which was constructed under a permit based on a variance of the front setback requirements. Appellant proposes to make no changes in the location of the underground fuel tanks approximately 15 feet east of the building and extending to the east. Appellant proposes to make no changes in the location of the diesel fuel dispenser at the southeastern corner of the building. Appellant proposes to make no changes in the paved access through to the Windjammer property. Appellant proposes to make no changes in the location of the two existing pump islands, so that the northerly of the two pump islands is proposed to be located approximately 15 feet from the flush sidewalk in front of the building, the two islands are separated by approximately 20 feet, and the southerly of the two pump islands is located approximately 13 feet from the northerly edge of the sidewalk along Williston Road.

Appellant proposes to extend the building approximately eight feet to the north, adding approximately 456 square feet of building. Appellant proposes to pave and widen the lane for vehicles to drive around the west and north sides of the building to allow enough space for two-way traffic around the back of the building. This area is planned to be approximately twenty-five feet wide at the dumpster location at the back of the building. Appellant also proposes to pave an area formerly on Lot 2 to the west of the building, so that the paved area will extend approximately 82 feet from the building towards the west. Appellant proposes to install ten parking spaces at the westerly edge of the new paved area, and six parking spaces at the easterly side of the combined property, each 10' x 20' in size, of which one on each side is proposed as a handicapped parking space. With the additional eight parking spaces at the pump islands (regardless of the number of fueling positions actually in use) the proposal exceeds the parking requirements of the zoning regulations. Appellant proposes to install a dumpster behind and to the northeast of the building, and to mark a five-foot-wide sidewalk on the pavement in front of the building. Appellant proposes to eliminate the curb cut that had served Lot 2 and to reduce the width of each of the two curb cuts on Lot 1, from 40 feet in width to 36 feet in width, so that the distance between the two curb cuts will measure approximately 56 feet.

Appellant received approval of the canopy now over the fuel islands.

Appellant received conditional use approval in 1999 of a plan showing the convenience store with three gasoline dispensers (having 6 fueling positions) and the diesel fuel dispenser, with the lighting plan as now proposed. This approval was not appealed and cannot now be challenged, either directly or indirectly. Accordingly, the conditional use approval of the two-dispenser plan may only be considered to the extent it poses differences from the already-approved three-dispenser plan.

The parties agree that the issues in these appeals are limited to the questions of pedestrian and vehicular access and circulation, compliance with traffic overlay district, and lighting (except that Appellant argues that the lighting plan was approved in the unappealed conditional use proceedings and cannot be relitigated here). The City agrees that the parking, landscaping and screening site plan requirements are met, except as additional screening and landscaping may be required by the asserted deficiencies in the lighting plan.

Appellant proposes to update the lighting plan, reducing the lighting under the canopy from eight 400-watt metal halide fixtures to eight 250-watt metal halide canopy lights, replacing two existing 400-watt metal halide pole-mounted fixtures at the front corners of Lot 1 with new 320-watt metal halide pole-mounted fixtures, and installing two additional 320-watt metal halide pole-mounted fixtures, one in the center of the western edge of the western parking area, and one in the northeasterly corner of the lot. This lighting plan will not create glare, and meets the requirements restricting light to the boundaries of the property, with the following exceptions. It illuminates the driveways and sidewalk at the Williston Road edge of the property, which is allowed under the regulations. It illuminates the parking area and paved access onto the parking area of the neighboring hotel property, which is allowed under the regulations. The fixture in the northeasterly corner of the lot illuminates a portion of the neighboring commercial lot to the north. If the lighting plan had not already been approved as part of the conditional use approval for the three-dispenser plan, it could be address in the present conditional use approval for the two-dispenser plan. However, as that approval was granted and not appealed, it cannot be challenged indirectly in the proceedings for the two-dispenser plan. The site plan criterion addressing the adequacy of screening and landscaping can address the illumination of the neighbor= s property in the northeastern corner, independently of the adequacy of the lighting plan.

Traffic Overlay Zone Criteria

If the proposal were analyzed as new construction, it would be permitted to generate only 20 vehicle trip ends (vte= s) in the afternoon peak hour, which the parties agree is the controlling peak hour for analysis. This is a measure of the amount of traffic the property use adds to the traffic on the adjacent roadway. Traffic generation figures are also important to analyze the turning movements a particular use will cause from and onto the adjacent roadway.

However, existing uses and changes to existing uses are analyzed somewhat differently from new construction under the South Burlington Zoning Bylaws. An existing use is allowed to continue in effect and a change in that existing use may be made if it does not generate traffic above that of the existing use. ' 21.50. Further, also under ' 21.50, the DRB and hence this court may approve an increase in predicted peak hour traffic volumes if A other site improvements will produce a net benefit for traffic flow in the vicinity.@

Using the ITE manual, the traffic estimated to be generated by a repair garage with three gasoline dispensers during the afternoon peak hour is 87 vte= s, by a convenience store with three gasoline dispensers is 115 vte= s, and by a convenience store with two gasoline dispensers is 77 vte= s. The City= s traffic consultant also did an actual traffic count of vehicles using the repair garage on January 27, 2000, September 19, 2001, and September 20, 2001, and counted the traffic generation on those dates to be 24 vte= s in the afternoon peak hour. We note that under any of the proposals the proportional effect of the traffic volume generated by this property on the actual volume of traffic on Williston Road is very small.

The City argues that for traffic generated by the existing use, we should use the actual counts made at the property rather than those predicted for the existing use by the ITE Manual. Several factors make it unwise to use the traffic counts to compare the traffic generated by the existing use with the traffic generated by the proposed uses. First of all, the regulations require use of the ITE Manual= s methods. Those methods allow comparison of the traffic predicted for different uses by the same methodology. The actual counts may be thought of as representing the predicted counts as adjusted for the present site by local factors. Some of those local factors may be chronic, such as the congestion of Williston Road, or the presence of a large, modern competing station across the street. Other local factors affecting the counts may have been temporary, such as construction at the highway interchange or the events of September 11, 2001. It is not possible to determine whether or which of those local factors should also be applied to reduce the traffic predicted to be generated by the proposed future uses at this site. For all these

reasons, even if the actual traffic generated by the repair garage with gasoline sales use in September 2001 was in fact lower than the traffic predicted by the ITE Manual for a repair garage with gasoline sales, the Court is convinced that it is a better practice to use the ITE Manual value to compare the traffic generation of the existing use, if it were to continue in the future, with that of the proposed use.

Using that method, and without adjusting for so-called > pass-by= traffic discussed below, the two-dispenser proposal can be expected to generate ten fewer trips than the existing use, and therefore can be approved under the traffic overlay district criteria. The three-dispenser proposal can be expected to generate 28 more trips than the existing use, and therefore can only be approved if other site improvements will produce a net benefit for traffic flow in the vicinity.

However, a number of site improvements will produce a net benefit for traffic flow in the vicinity. First of all, the particular change of use category will have the effect both of decreasing the number of vehicles <u>added</u> to the roadway by the proposed use, and of decreasing the number of left-hand turns (across two lanes of oncoming traffic in either direction) made necessary by the proposed use. This benefit is a result of the differing behavior of customers of a vehicle repair garage compared to customers seeking only to purchase gasoline and/or convenience store items. For most types of uses, including both of the use categories at issue in the present case, not all the vehicles generated by the use are vehicle trips to the facility as a primary destination. Rather, a certain percentage can be estimated to be so-called > pass-by= trips: those on the road for another reason and making a stop at this property. For the existing use of a repair garage and gasoline sales, a smaller percentage are pass-by trips (52% pass-by) as compared with the proposed use of a convenience store with gasoline sales (66% pass-by). That is, the customers of a repair garage generally arrange in advance for their car repair appointments, and generally leave their cars in the morning and pick up their cars in the late afternoon. They make a trip specifically to the repair garage, whether or not they would have been traveling on Williston Road to go to work or for another reason. In addition, as this is one of the last full-service gasoline stations in the area, some current gasoline customers may similarly go out of their way to patronize the existing station to avail themselves of the service of having their gas pumped by an attendant. The change to self-service in both proposals is expected to result in a reduction in those destination trips, as some of those customers will patronize other gas stations more convenient to their trip, whether nearer to home or on the way to work. Moreover, the reduction in destination trips reduces the need for traffic to or from this property to make a left turn across Williston Road, as only some proportion of the destination trips would have had to have made that maneuver. All the pass-by trips can be expected to come from westbound vehicles on Williston Road or from vehicles coming through the access from the adjacent hotel and restaurant. Drivers traveling on the eastbound side of Williston Road can be expected to stop at a similar facility on the eastbound side. Thus, for both proposals, the change from a repair garage with gasoline sales to a convenience store with gasoline sales will produce a net benefit for traffic flow on Williston Road by reducing the number of destination trips and left turns across traffic generated by the property.

The closure of the residential driveway on Lot 2 will have the modest but measurable benefit of reducing the traffic otherwise generated by the site by 4 vte= s. Finally, the proposal to making the access through to the hotel property permanent[2] provides a benefit to this property for traffic wishing to return to Williston Road via a signalized intersection, and a benefit to the neighboring hotel property of an alternate access for its normal traffic and for emergency vehicles to have access to that property if its other (sole) access is blocked. These factors compensate for the increase in traffic generation so that, absent problems of site circulation, both proposals meet the criteria of the Traffic Overlay Zone.

Site Plan Criteria - Vehicular and Pedestrian Access and Circulation

However, regardless of whether the traffic would have been on Williston Road anyway, that is, regardless of the proportion of pass-by trips, the traffic generated by this use must also be analyzed in terms of whether turning movements onto and from the property during the afternoon peak hour cause any problems, either for the traffic on Williston Road or for traffic circulation on the property itself, and whether the site is adequately designed to handle on site circulation.

Without further design changes, the site plans do not provide adequate vehicular access and do not provide adequate vehicular or pedestrian on site circulation. Vehicles entering the current site must make a very shallow angle across the curb cuts to obtain a position at the fueling island closest to the street, or else must make successive movements to back up and move forward to reach that position. If another vehicle is occupying any of the fueling positions closest to the driveway, a vehicle queuing for that fueling position must wait in a position obstructing the access driveway. Narrowing of the curb cuts will only exacerbate these problems of making the sharp turn into the fueling positions closest to the sidewalk, although otherwise generally narrower curb cuts provide an improvement in the positioning of vehicles making a 90-degree turn from a street onto a property. The site configuration promotes conflict between vehicles entering and leaving the property and vehicles maneuvering to access the fueling positions. If all four sides of the two islands are in use by fueling cars, frustrated drivers can be expected to stack up behind them, blocking access especially from the easterly driveway, or can be expected to back up into that maneuvering area in order to drive around the back of the building or exit through the hotel lot. Because no through lane is provided in front of the building, drivers may even drive on the sidewalk to get around a blockage at the pumps. The availability of circulation around the back of the building will improve the site circulation, and the availability of the rear access will improve site access (and egress), but only if adequate signage (not now proposed) informs site users of the availability of that access, and in particular that it connects with a signalized intersection for access back to Williston Road.

The location of the diesel pump, although perhaps little used, is placed to cause conflict with vehicles accessing the gasoline fueling positions, and with customers walking from their cars in the easterly parking spaces to the building. Should a large truck or tractor-trailer truck come onto the site to fuel at the diesel pump and exit through the hotel parking lot, it could block some or all of the gasoline fueling positions and require drivers to drive behind the building either to maneuver into the fueling positions from the other side or to exit the site out the other driveway. The lack of adequate space between the fueling positions nearest the front of the building and the building will also cause conflict with customers using the area reserved as a sidewalk to the front of the building.

We must note that the alternate site plan ideas suggested by the City=s expert witness are not before the Court in this application. The Court is precluded from considering redesigns of the project unless they have first been submitted to the DRB for its consideration. Further, it is unclear to the Court whether Appellant feels itself constrained by the location of its approved canopy, or whether instead it could apply, as part of an improved site plan, to rotate the existing canopy 90 degrees or to move the canopy to place the fueling operation to the west of the building. It is possible that changes in the site plan could be developed provide a through lane in front of the building by placing the dispensers on a single long island between the locations of the current islands, or to place them on two or three short islands placed obliquely in that space. It is possible that the diesel pump could be moved to a location in which it would cause less conflict. It is possible that the entrances to the store could be designed on the east and west ends of the building, reducing the need for a sidewalk on the south side of the building. However, such design changes are not before the court and we will not further analyze them here.

Because the site plans do not provide for adequate vehicular access or for adequate on-site vehicular and pedestrian circulation, they cannot be approved as proposed.

Lighting as related to the Adequacy of Screening and Landscaping

The lighting plan is identical for the two-dispenser and the three-dispenser plans, and that therefore the unappealed approval cannot be challenged in this proceeding. However, the adequacy of screening and landscaping can address the illumination of the neighbor= s property in the northeastern corner., either The lighting plan can be approved with the condition that Appellant either propose a fixture shield or box for the northeasterly fixture that will prevent the illumination of the neighboring property, or propose additional fencing or landscaping to screen light from the neighboring property, or present a request signed by that neighboring landowner requesting that the illumination be allowed to fall on the neighboring property as proposed.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the site plans proposed for the two- and three-dispenser plans are approved as to the traffic overlay criteria, but are denied as to the site plan criteria for access and on-site circulation, without prejudice to submittal of changed plans to address the problems discussed above as to those criteria.

Dated at Barre, Vermont, this 24th day of June, 2002.

_____

Merideth Wright

Environmental Judge

---

**Footnotes**

[1] Testimony was presented as to whether the lengthening of this taper would improve the behavior of traffic at the Williston Road/Dorset Street intersection. Even if it would be an improvement, such a proposal is not before this Court and would in any event involve a taking of a narrow portion of the front of Lot 1, for which Appellants would be entitled to be compensated.

[2] The availability of this alternate access will only be a benefit to traffic in the vicinity if the drivers using the site know of the existence of the alternate access to Williston Road through the signalized intersection. Accordingly, appropriate signs should be required within the westerly parking area and at the pass-through visible from the easterly parking area, directing drivers, for example, to 'access to Williston Road at traffic signal' or similar language. No signage or proposed language has been provided to the Court; it is therefore not reviewed here.